IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Darryl Farmer, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| *-vs-* | ) | No. 10 CV 05055 |
| | ) | |
| Dr. Thomas, | ) | *(Judge Guzman)* |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S LOCAL RULE 56.1(b)(3) STATEMENT

Plaintiff submits the following in response to the Local Rule 56.1(a)(3) statement (Document 76) filed by defendant Thomas:

1.     At the time of the events described in his complaint, plaintiff, Darryl Farmer, was incarcerated in the custody of the Illinois Department of Corrections, housed at the Northern Reception and Classification Center ("NRC").)

Response:  Agreed.

2.     Defendant, Dr. Thomas, was employed as a dentist at the NRC at the time of the operative events described in the plaintiff's complaint.

Response:  Agreed.

3.     A Stipulation of Dismissal as to Defendant Miles was filed on May 7, 2013.

Response:  Agreed.

4.     Plaintiff's Complaint purports to state a claim against Dr. Thomas under 42 U.S.C. §1983, premised on an allegation of deprivation of dental care while incarcerated at the NRC, which is located in the Northern District of Illinois. Specifically, plaintiff alleged that Dr. Thomas "did not prescribe any antibiotics and did not refer plaintiff to a dentist" for his dental condition. Plaintiff has submitted an expert report of his retained expert witness, which is attached as Exhibit I.

Response: Agreed.

5. Before coming to the NRC, Mr. Farmer was in pre-trial detention at the Champaign County Jail in May and June 2009.

Response: Agreed.

6. Mr. Farmer first sought dental treatment for his wisdom tooth while in the Champaign County Jail in May 2009. Specifically, Mr. Farmer complained of left molar pain.

Response: Agreed.

7. At various times while in the Champaign County Jail, Mr. Farmer was given penicillin, Bactrim, ibuprofen, naproxen and Orajel in response to his dental complaints.

Response: Agreed.

8. While at the Champaign County Jail, Mr. Farmer filed a grievance in which he stated that he had an abscess that would cause him extreme pain, that his tooth infection could cause him to die if left untreated and asserted that he was being treated with deliberate indifference.

Response: Agreed.

9. Mr. Farmer underwent a seven-day course of 500 mg oral penicillin from June 12 through June 19, 2009, while in the Champaign County Jail.

Response: Agreed.

10. Six days after his course of penicillin ended, Mr. Farmer came into the NRC on June 25, 2009.

Response: Agreed.

11. [a] Dr. Thomas screened Mr. Farmer upon his entrance to the NRC on June 25, 2009. [b] This was not a dental examination but rather a brief screening all new inmates go through when processed on intake at NRC.

Response: [a] Agree that Dr. Thomas examined plaintiff on his entrance to the NRC on June 25, 2009. The conventional definition of "screened" in this context is to examine in order to make a separation into different groups. Webster's Third New International Dictionary, Unabridged, s.v. "screen," accessed June 01, 2013, http://unabridged.merriam-webster.com. Defendant is unable to present any admissible evidence to show this type of "screening" examination.

[b]    Disputed. Defendant is unable to support this contention with admissible evidence. That Thomas' employer granted her "four to five hours to screen two to 300 inmates" (Document 76-3, Defendant's Exhibit C, Thomas Dep. 10:24-1) does not mean that Thomas was unable to exercise independent professional judgment and identify a prisoner who, like plaintiff, stated that he was in pain, that he had been prescribed penicillin to treat an infection on the tooth that was the source of the pain, and opened his mouth to show the dentist the source of the pain. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:17-18; Plaintiff's Exhibit 1.)

12.    [a] At the time of Mr. Farmer's intake screening, Dr. Thomas was working in tandem with another dentist; [b] Dr. Thomas visually examined the inmate's teeth, and [c] the other dentist would review the inmate's dental x-ray.

Response:    [a]    Agreed.

[b]    Agreed.

[c]    Disputed. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 19:16-21:18) (Plaintiff carried x-ray to Dr. Thomas, who looked at the x-ray and said "she couldn't do nothing for me right then." (Document 76-2, Defendant's Exhibit B, Farmer Dep. 21:10-11.)

13.    Dr. Thomas did not have access to any documentary medical or dental history for Mr. Farmer at the time of his intake screening.

Response:    Disputed. Dr. Thomas reviewed the dental x-ray. (Document 76-2, Defendants' Exhibit B, Farmer Dep. 21:4-7.)

14. Mr. Farmer expressed to Dr. Thomas only that he had a toothache, and he opened his mouth to show her his tooth.

Response:    Disputed. Document 76-2, Defendant'sExhibit B, Farmer Dep. 9:13-15 ("When I came in, I couldn't really talk because my mouth was hurting, and one of the officers, like, pushed me toward that way.") Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:17-18 (Farmer told defendant "that I was hurting, and opened my mouth and trying to show her.")

15.    Dr. Thomas's custom and practice when an inmate presents with dental pain during his intake screening is to ask questions to determine whether there are any signs and symptoms of infection, which may necessitate treatment with antibiotics. The inmate is examined to determine if he has tenderness in the lymph nodes, cellulitis or gross swelling, and if none of those problems exist, he would just be given pain medication.

Response:  Disputed. Dr. Thomas' opinion about the appropriate proce-
dure "[w]hen a patient expresses that they have pain" (Defendant's Docu-
ment 76-3, Defendant's Exhibit C, Thomas Dep. 30:4), is inadmissible to
prove that she followed that procedure in her interaction with plaintiff.
Moreover, plaintiff stated at his deposition that after he told Dr. Thomas
that "I was hurting and opened my mouth and tri[ed] to show her," (Docu-
ment 76-2, Defendant's Exhibit B, Farmer Dep. 9:17-18), Thomas looked
into plaintiff's mouth and "said she couldn't do nothing right there, right at
this moment." (Defendant's Document 76-2, Defendant's Exhibit B,
Farmer Dep. 9:22-23.)

16.  Mr. Farmer did not present with any acute symptoms for in-
fection at the time of entry into NRC.

Response:  Disputed. Document 76-2, Defendant's Exhibit B, Farmer
Dep. 9:12-18 ("I couldn't really talk because my mouth was hurting" and I
was "trying to show her.") Plaintiff's Exhibit 1, Offender's Grievance
(plaintiff told Dr. Thomas at intake "that I had been taking
PENICILLLIN, but they were all gone, and I needed something for my
teeth.")

17.  There is no documentary evidence in this case to indicate
that Mr. Farmer informed Dr. Thomas of his recent history of in-
fection and antibiotic use at the Champaign County Jail.

Response:  Disputed. Plaintiff's Exhibit 1, Offender's Grievance (plaintiff
told Dr. Thomas at intake "that I had been taking PENICILLLIN, but
they were all gone, and I needed something for my teeth.") Moreover, the
deposition testimony of plaintiff's expert that he has not "seen any docu-
mentary evidence that Mr. Farmer informed Dr. Thomas of his recent his-
tory of infection and antibiotic use at the Champaign County jail when she
screened him during his intake on June 25th, 2009," Document 76-5, De-
fendant's Exhibit E, Shulman Dep. 50:6-11), is inadmissible to prove the
absence of "documentary evidence."

18.  When asked to relate what he told Dr. Thomas during his in-
take screening, Mr. Farmer did not testify that he told Dr. Thom-
as about his prior infection or the antibiotic treatments at the
Champaign County Jail.

Response:  Disputed. Plaintiff's Exhibit 1, Offender's Grievance (plaintiff
told Dr. Thomas at intake "that I had been taking PENICILLLIN, but
they were all gone, and I needed something for my teeth.") Moreover, the
deposition testimony of plaintiff's expert about his recollection, or lack

thereof, of plaintiff's deposition testimony (Document 76-5, Defendant's Exhibit E, Shulman Dep. 75:23-76:1) does not support this contention.

| | | |
|---|---|---|
| [75:23] | Defense Counsel: | And he did not testify that he told her about his prior infection or the antibiotic treatments at the Champaign County jail, true? |
| [76:1] | Dr. Shulman | Oh. |

In addition, the absence of particular testimony from a witness is not probative of how the witness would have answered a question had it been posed, i.e., defense counsel did not ask plaintiff whether he told Dr. Thomas about his prior infection or the antibiotic treatments at the Champaign County Jail.

19.  There is no documentary evidence in this case prepared contemporaneously with Mr. Farmer's June 25, 2009, intake screening indicating that he presented outward signs or symptoms of infection. (Shulman Dep. at 66:12-18.)

Response:  Disputed. Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:13-15 ("When I came in, I couldn't really talk because my mouth was hurting, and one of the officers, like, pushed me toward that way.") Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:17-18 (Farmer told defendant "that I was hurting, and opened my mouth and trying to show her.") Moreover, the deposition testimony of plaintiff's expert cited by defendant for this contention about his recollection, or lack thereof, of plaintiff's deposition testimony (Document 76-5, Defendant's Exhibit E, Shulman Dep. 66:12-18) is not on point:

| | | |
|---|---|---|
| [66:12] | Defense Counsel: | You've seen no documentary evidence prepared contemporaneously with Mr. Farmer's June 25th, 2009 intake screening that indicated that he presented outward signs or symptoms of infection, true? |
| [66:16] | Dr. Shulman | That's true. It would have been in the acc -- in the intake exam report, but I don't have access to that. |

20.  It is possible that Mr. Farmer's toothache pain was less on June 25 than it had been on June 12 given his intervening course of antibiotic treatment, which can assist in the reduction of pain by reducing swelling.

Response:  Objection: This "possibility" is not germane to summary judgment. Moreover, the "pure speculation" of plaintiff's expert on this

question (Document 76-5, Defendant's Exhibit E, Shulman Dep. 61:17-18) is not admissible to prove that pain had or had not subsided.

21.     [a] As a dentist within the prison system, Dr. Thomas did not have the authority to prescribe narcotics to Mr. Farmer. [b] She was only allowed by the state to prescribe Motrin or a form of aspirin for inmates. [c] Tylenol may be used as an alternative. [c] The strongest formulation of Motrin allowed in the prison system is 400 mg.

Response:    [a]    Agreed.

            [b]    Disputed. The two forms of pain medication available to Dr. Thomas were Tylenol and Motrin. (Document 76-3, Defendant's Exhibit C, Thomas Dep. 33:20-21.) (Motrin is not "a form of aspirin." "MOTRIN® products contain ibuprofen, a nonsteroidal anti-inflammatory drug (NSAID)." http://www.motrin.com/news, visited June 2, 2013. Aspirin "is in a group of medications called salicylates." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682878.html, visited June 2, 2013.

            [c]    Agreed.

            [d]    Disputed. Dr. Thomas had the power to prescribe two (or three) pills of 400 mg Motrin every two to six hours. This is precisely what Dr. Thomas did when she prescribed Tylenol on July 7, 2009, with instructions that plaintiff should take the pain reliever one or two tablets "Q4 or 6H PRN" (every four or six hours if requested by patient). Document 76-3, Defendant's Exhibit C, Thomas Dep. 38:20-22.

22.     [a] Based on Mr. Farmer's complaint of a toothache during his intake screening, [b] Dr. Thomas prescribed 30 tablets of Motrin 400 mg with instructions to take one every four to six hours as needed for pain.

Response:    [a]    Disputed. Thomas prescribed Motrin after plaintiff told her "that I was hurting, and opened my mouth and trying to show her.") Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:17-18.) Thomas prescribed Motrin in response to plaintiff's report that he had been taking penicillin related to dental pain, "but they were all gone and I needed something for my tooth." (Plaintiff's Exhibit 1, Offender's Grievance.) Thomas also prescribed Motrin after plaintiff told her that he could not take ibuprofen (the main ingredient of Motrin) "because I have ulcers." *Id.*

            [b]    Agreed.

23. Following Mr. Farmer's intake on June 25, 2009, there is no record of Mr. Farmer making any further dental complaints until July 5, 2009.

Response:    Objection. Plaintiff's expert lacks firsthand knowledge about the existence, or non-existence, of records maintained by the Illinois Department of Corrections.

24. On July 5, 2009, at 9:40 a.m., Mr. Farmer made a complaint of dental pain and was referred for a dental evaluation.

Response:    Agreed.

25. There was no documented complaint of swelling or trismus on July 5, 2009.

Response:    Objection. Plaintiff's expert lacks firsthand knowledge about the existence, or non-existence, of records maintained by the Illinois Department of Corrections. Moreover, defendant is unable to present any foundation testimony to show that anyone conducted an oral examination of plaintiff on July 5, 2009 that would disclose the existence, or non-existence, of swelling or trismus.

26. [a] Mr. Farmer was then seen by Dr. Thomas on July 7, 2009, [b] in the NRC one-chair clinic, which is not a full dental office but just used to handle dental emergencies.

Response:    [a]    Agreed.

        [b]    Disputed. Dr. Thomas' testimony about the "NRC one-chair clinic" is irrelevant, especially without any showing that the "one chair clinic" was related to her alleged deliberate indifference on July 7, 2009.

27. [a] On July 7, 2009, Mr. Farmer presented with cellulitis and trismus. [b] Trismus is the inability to open the mouth normally, [c] but the presence of the condition does not mean one cannot open his mouth at all.

Response:    [a]    Agreed.

        [b]    Disputed. Document 76-3, Defendant's Exhibit C, Thomas Dep. 38:15-16 ("trismus" is being "unable to open")

        [c]    The opinion by the defense expert that trismus "does not mean one cannot open his mouth at all" is irrelevant because plaintiff was unable to open his mouth. Document 76-3, Defendant's Exhibit C, Thomas Dep. 38:15-16.

28.   [a] Dr. Thomas recognized this presentation to be indica-
tive of infection [b] so she prescribed an antibiotic. [c] She
also prescribed Tylenol [d] to alleviate Mr. Farmer's pain, [e]
referred him for a dental extraction and [f] put him on a soft
diet [g] until he could have his tooth extracted.

Response:   [a]   Agreed.

       [b]   Disputed insofar as "so she prescribed" implies that Dr.
Thomas acted reasonably. Dr. Thomas should have recognized plaintiff's
symptoms as indicative of trismus with cellulitis, a potentially life-
threatening condition that must be monitored by medical personnel. Doc-
ument 76-9, Defendant's Exhibit I, Shulman Report at 2-3. Dr. Thomas' ac-
tions "amounted to no treatment at all." *Id.* After observing the trismus
with cellulitis, Dr. Thomas should have made sure that plaintiff's tooth was
extracted that same day. *Id.*

       [c]   Agreed.

       [d]   Disputed insofar as "to alleviate Mr. Farmer's pain" im-
plies that Thomas acted reasonably. Dr. Thomas prescribed Tylenol tablets
after noting that plaintiff could not open his mouth. Document 76-3, De-
fendant's Exhibit C, Thomas Dep. 38:15-16.

       [e]   Agreed.

       [f]   Agreed.

       [g]   Disputed insofar as "until he could have tooth extract-
ed" implies that Dr. Thomas acted reasonably in prescribing a soft diet for
a person who could not open his mouth. Dr. Thomas' actions "amounted to
no treatment at all." Document 76-9, Defendant's Exhibit I, Shulman Re-
port at 2-3.

29.   The antibiotic prescribed by Dr. Thomas was penicillin VK
500 mg to be taken every six hours. Thirty tablets were to be
dispensed, which would amount to a seven and one-half day supply.

Response:   Agreed.

30.   Mr. Farmer never saw Dr. Thomas again after July 7, 2009.

Response:   Agreed.

31.   Mr. Farmer took three penicillin pills on July 7, 2009, per
Dr. Thomas's prescription.

Response:   Disputed. Plaintiff's expert lacks personal knowledge about
the occurrences of July 7, 2009. The IDOC records cited by defendant

(Document 76-8, Defendants' Exhibit H) do not include any record showing that penicillin had actually been dispensed; nor do the IDOC records contain any "medication administration record" to show that the antibiotic had been administered.

32. Mr. Farmer's condition worsened overnight after seeing Dr. Thomas on July 7, 2009.

Response: Disputed. Neither Dr. Thomas nor plaintiff's expert has personal knowledge about plaintiff's condition on July 8, 2009. Defendant volunteered the statement that plaintiff's chart showed that "the condition had worsened in spite of him taking the Penicillin." (Document 76-3, Defendants' Exhibit C, Thomas Dep. 55:6-7.), but Dr. Thomas did not see plaintiff after July 7, 2009 (Contention 30 above), and her conclusion that plaintiff's condition "had worsened" assumes that the different diagnosis on July 8, 2009 was due to something other than a change in dentists. Moreover, the trismus could not get worse after July 7, 2009, when it prevented plaintiff from opening his mouth at all. Defendant's Exhibit C, Thomas Dep. 38:15-16.

33. [a] On July 8, 2009, Mr. Farmer began complaining of swelling in the left jaw and difficulty swallowing. [b] The degree of trismus was worse, and he was barely able to open his mouth.

Response: [a] Disputed. Plaintiff had been unable to sleep for five days, and he had been unable to open his mouth for three days. (Document 76-3, Defendant's Exhibit C, Thomas Dep. 56:7-57:6.) In addition, plaintiff could not open his mouth on July 7, 2009. Document 76-3, Defendant's Exhibit C, Thomas Dep. 38:15-16.

[b] Disputed. Plaintiff had been unable to open his mouth on July 7, 2009. Document 76-3, Defendant's Exhibit C, Thomas Dep. 38:15-16.

34. Mr. Farmer was then sent to the infirmary and placed on IV antibiotics.

Response: Agreed.

35. Shortly thereafter, Mr. Farmer was sent to the University of Illinois Hospital where he underwent definitive treatment for his infection and had his tooth extracted. He underwent an extraoral incision and drainage procedure with surgical extraction of the problem tooth - tooth #17 - on July 10, 2009.

Response: Agreed.

36.   Mr. Farmer has had no further problem related to his tooth following its surgical extraction on July 10, 2009.

Response:   Disputed. The surgery left plaintiff with a lumpy scar on his throat. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 25:8-18.)

37.   There can be non-dental etiologies for a toothache.

Response:   Agreed, but not germane to summary judgment.

38.   Not all instances of odontogenic pain require treatment, significantly affect daily activities, cause chronic and substantial pain, or are likely to worsen without treatment.

Response:   Agreed, but not germane to summary judgment.

39.   A complaint of toothache by itself does not indicate infection.

Response:   Agreed, but not germane to summary judgment.

40.   Where the need for a dental procedure is recognized, it is appropriate to provide interim management of the pain until the procedure can be performed.

Response:   Disputed as applied to the facts of this case. "When you have trismus, the red light goes off, and you send them to an oral surgeon ASAP. Likewise, trismus in conjunction with cellulitis is a red flag that starts waving in front of you. Time -- time to send the patient out." Document 76-5, Defendant's Exhibit E, Shulman Dep. 35:6-11.

41.   Dr. Shulman testified that an acute localized dental infection should be managed without antibiotics. However, where there is evidence of a spreading infection, it would be appropriate to use antibiotic management, which could be either oral or parenteral.

Response:   Disputed. See response to contention 40. In addition, when there is "[c]ellulitis with trismus, I would not go oral. I think it's time for parenteral; I think it's intramuscular or perhaps IV. It just depends. But the oral surgeon is the one to make that decision. I – a general dentist should know enough to know when to send the patient to someone else." Document 76-5, Defendant's Exhibit E, Shulman Dep. 35:8-14.

42.   When antibiotic management is indicated with a dental infection, the penicillin family is the standard. For a typical, run-of-the-mill infection that has spread beyond the localized area of the tooth, the typical antibiotic regimen would be oral penicillin 500 mg, three or four times per day, for seven days.

Response:     Agreed, but not germane to the facts of this case.

43.   If a dental infection is treated with antibiotics, the symptoms and outward signs of the infection can diminish as a result of the antibiotic's use. The antibiotic can reduce swelling and pain.

Response:     Agreed, but not germane to the facts of this case.

44.   Antibiotic use would not clear the dental infection. If antibiotics are stopped and there is no definitive treatment for the source of the infection, the infection could return to its previous state or progress. The definitive treatment would be an extraction or endodontic therapy.

Response:     Agreed, but not germane to the facts of this case.

45.   Dr. Shulman is critical of the institutional process of having two dentists perform screening with one examining the inmate's mouth and the other reviewing x-rays. However, he acknowledged that Dr. Thomas did not institute this process.

Response:     Agreed, but not germane to the facts of this case.

46.   Dr. Shulman is further critical of the institutional screening process in place at the NRC, which would allow only a few hours to process 200 to 300 inmates, believing this to allow insufficient time for an intake screening. However, he acknowledged that Dr. Thomas did not make the decision as to how many inmates were going to be processed in a given time frame.

Response:     Agreed, but not germane to the facts of this case. Moreover, while Dr. Thomas did not establish the policy for the NRC, "she does control the examination of her patient. If she has a patient who's manifestly in pain, she has an obligation to deal with that patient in front of her, even if it means stopping the assembly line." Document 76-5, Defendant's Exhibit E, Shulman Dep. 78:12-16.

47.   While Dr. Shulman was critical of the time Dr. Thomas spent with Mr. Farmer during his intake screening, he acknowledged that her limited time with Mr. Farmer was the product of time constraints imposed by the institutional process and not because Dr. Thomas was indifferent to Mr. Farmer's pain or wanted to punish him.

Response:     Agreed, but not germane to the facts of this case. Moreover, "I'm simply saying that the patient, when he came in there with a – with a – with a problem and pain, she should have – she should have inquired a bit more." Document 76-5, Defendant's Exhibit E, Shulman Dep. 80-19-22.

48.  [a] In retrospect, Dr. Shulman believes that Mr. Farmer had an unresolved infection on June 25, 2009. [b] However, he acknowledged that Dr. Thomas may not have realized this at the time of the intake screening on June 25, 2009.

Response:  [a]  Agreed.

[b]  Dr. Shulman's opinion as to what Dr. Thomas "may not have realized" is not germane to summary judgment and would be inadmissible at trial.

49.  Dr. Thomas's prescription of Motrin (ibuprofen) for Mr. Farmer's complaint of toothache on June 25, 2009, apparently provided relief to Mr. Farmer as he made no further complaint of pain for ten days; hence, the level of his toothache-related pain on June 25, 2009, was likely mild.

Response:  Disputed. First, the opinion of defendant's expert is inadmissible to show whether or not plaintiff complained of pain for ten days. Second, the Motrin was never provided to plaintiff. Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:22-10:1.

50.  [a] Dr. Shulman does not believe Dr. Thomas was aggressive enough in responding to Mr. Farmer's presentation on July 7, 2009. However, he acknowledged that Dr. Thomas did order modalities directed toward Mr. Farmer's presenting signs and symptoms on July 7, 2009.

Response:  [a]  Disputed. Dr. Shulman believes that Dr. Thomas actions on July 7, 2009 "amounted to no treatment at all." Document 76-9, Defendant's Exhibit I, Shulman Report at 2.

[b]  Disputed. The "modalities" ordered by Dr. Thomas "amounted to no treatment at all." Document 76-9, Defendant's Exhibit I, Shulman Report at 2.

51.  Dr. Shulman believes that as a result of not understanding the seriousness of Mr. Farmer's condition on July 7, Dr. Thomas made the decision to prescribe oral antibiotics and return Mr. Farmer to his housing unit until his extraction appointment rather than sending him to the infirmary. Dr. Shulman nevertheless acknowledged that the oral penicillin prescribed by Dr. Thomas would have "some utility." [c] He further acknowledged that the antibiotic regimen prescribed by Dr. Thomas on July 7, 2009, was "standard" for a dental infection.

Response:  Objection: These statements elicited from Dr. Shulman are not germane on summary judgment.

52. Dr. Shulman opined that the Tylenol prescribed by Dr. Thomas on July 7, 2009, would probably not have made a difference. However, he acknowledged that it was "marginally better than nothing."

Response:   Objection: These statements elicited from Dr. Shulman are not germane on summary judgment.

53. Dr. Shulman agrees with Dr. Thomas's conclusion that extraction of Mr. Farmer's tooth was indicated on July 7, 2009.

Response:   Disputed. Dr. Shulman's opinion is that "[u]pon making the diagnosis of trismus, Dr. Thomas should have referred Farmer to a controlled medical environment where he could have been monitored by medical staff, started on intravenous antibiotics and transported to an oral surgeon or a hospital as his condition dictated. Prescribing an oral antibiotic and a soft diet and allowing Farmer to return to his housing unit, given his potentially life-threatening condition, amounted to no treatment at all." Document 76-9, Defendant's Exhibit I, Shulman Report at 2.

54. Dr. Shulman opined that Mr. Farmer's tooth had reached the point of decay where it was going to need to be extracted prior to his intake screening at NRC.

Response:   Agreed.

55. Dr. Shulman opined that Mr. Farmer's dental infection started prior to the date of his intake screening on June 25, 2009, by Dr. Thomas at the NRC.

Response:   Agreed.

56. Dr. Shulman was unable to opine whether Mr. Farmer's infection had progressed to the point of needing an extraoral incision and drainage procedure by July 7, 2009.

Response:   Objection: Dr. Shulman's inability to offer an opinion on this issue is not germane to summary judgment.

57. In his review of this case, Dr. Shulman saw no evidence that Dr. Thomas had a specific motive or desire to punish Mr. Farmer.

Response:   Objection: Dr. Shulman's inability to find evidence of "a specific motive or desire to punish" is not germane to summary judgment. Moreover, any opinion on this issue would be inadmissible.

## PLAINTIFF'S ADDITIONAL FACTS

1.  Plaintiff arrived at the "Northern Reception Center" ("NRC") of the Illinois Department of Corrections on June 25, 2009 following his conviction of possession of a weapon that had been found in the trunk of his car. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 5:7-8.)

2.  When plaintiff arrived at the NRC, his "mouth was hurting." (Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:14.)

3.  As part of the intake procedure to the NRC, plaintiff received an x-ray of his "whole mouth" (Document 76-2, Defendant's Exhibit B, Farmer Dep. 19:23), which he presented to defendant Thomas. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 20:10-14, 21:4-9.)

4.  Plaintiff spoke with defendant Thomas at intake, and told Dr. Thomas that he had been taking penicillin, but the pills were gone and he needed something for his teeth. (Plaintiff's Exhibit 1.)

5.  While being examined by defendant, plaintiff opened his mouth and tried to show her the source of his pain. Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:17-18.)

6.  Defendant Thomas looked in plaintiff's mouth and at his full mouth x-ray (Document 76-2, Defendant's Exhibit B, Farmer Dep. 21:8-18), and told him that she could not do anything at that time. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:22.) Plaintiff asked her "to do

something," and Dr. Thomas told plaintiff that she had prescribed "something." (Document 76-2, Defendant's Exhibit B, Farmer Dep. 9:24-10:1.)

7.     Dr. Thomas wrote a prescription for Motrin, a nonsteroidal anti-inflammatory drug that contains ibuprofen,[1] which should not be taken by persons, like plaintiff, who have ulcers. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 10:14, Document 76-3, Defendant's Exhibit C, Thomas Dep. 33:17-21.)

8.     Plaintiff did not receive any medication that Thomas prescribed on June 25, 2009. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 10:1.)

9.     The actions of Dr. Thomas during the intake examination on June 25, 2009 were hurried, incomplete, and perfunctory, did not permit her to identify serious oral problems, such as abscesses and malignancies, and were so far below accepted professional standards that they could not have been based on a medical judgment. (Document 76-9, Defendant's Exhibit I, Shulman Report at 1.)

10.     Had Dr. Thomas taken the time to ask plaintiff standard questions about his toothache, such as its duration and his previous treatment, she would have realized that plaintiff's toothache was sufficiently serious

---

[1] http://www.motrin.com/news, visited June 2, 2013.

to warrant prompt treatment and follow-up. (Document 76-9, Defendant's Exhibit I, Shulman Report at 1-2.)

11.    Plaintiff's condition worsened following his admission to the NRC: after about a week, his mouth "locked up" and he "couldn't even put a straw in it." (Document 76-2, Defendant's Exhibit B, Farmer Dep. 24:23-25:4.)

12.    Dr. Thomas examined plaintiff on July 7, 2009 and observed that plaintiff could not open his mouth. (Document 76-3, Defendant's Exhibit C, Thomas Dep. 38:16.)

13.    When plaintiff saw Dr. Thomas on July 7, 2009, he had been unable to sleep for five days (i.e., since July 2, 2009), and he had been unable to open his mouth for three days (i.e., since July 4, 2009). (Document 76-3, Defendant's Exhibit C, Thomas Dep. 56:7-57:6.)

14.    Dr. Thomas diagnosed plaintiff's condition as "trismus." (Document 76-3, Defendant's Exhibit C, Thomas Dep. 38:15.)

15.    Trismus "is a sign of deep fascial plane infection that can be one of the most serious infections of the human body that must be treated aggressively and without delay." (Document 76-9, Defendant's Exhibit I, Shulman Report at 5.)

16. Trismus carries with it "life-threatening complications." (Document 76-9, Defendant's Exhibit I, Shulman Report at 5.)

17. Recognition of trismus "is imperative, and the patient must be referred to an oral and maxillofacial surgeon or a physician who may have to manage the patient in a hospital setting." (Document 76-9, Defendant's Exhibit I, Shulman Report at 5.)

18. "When you have trismus, the red light goes off, and you send them to an oral surgeon ASAP. Likewise, trismus in conjunction with cellulitis is a red flag that starts waving in front of you. Time -- time to send the patient out." Document 76-5, Defendant's Exhibit E, Shulman Dep. 35:6-11.

19. The actions taken by Dr. Thomas after examining plaintiff on July 7, 2009 – prescribing an oral antibiotic and a soft diet and allowing plaintiff to return to his housing unit, given his potentially life-threatening condition – "amounted to no treatment at all." Document 76-9, Defendant's Exhibit I, Shulman Report at 2.

20. "Upon making the diagnosis of trismus, Dr. Thomas should have referred Farmer to a controlled medical environment where he could have been monitored by medical staff, started on intravenous antibiotics,

and transported to an oral surgeon or a hospital as his condition dictated." Document 76-9, Defendant's Exhibit I, Shulman Report at 2.

21.    Plaintiff underwent surgery at the University of Illinois on July 10, 2009. (Plaintiff's Exhibit 2.) The procedure required general anesthesia and intubation. (Plaintiff's Exhibit 2 at 2-3.)

22.    Before the surgery, plaintiff "had been carrying this infection around for months." (Document 76-3, Defendant's Exhibit C, Thomas Dep. 48:2-3.)

23.    The surgery left plaintiff with a lumpy scar on his throat. (Document 76-2, Defendant's Exhibit B, Farmer Dep. 25:8-18.)

/s/  Kenneth N. Flaxman
Kenneth N. Flaxman
ARDC No. 830399
200 S Michigan Ave Ste 201
Chicago, IL 60604-2407
(312) 427-3200
*Attorney for Plaintiff*

**Exhibit 1**

**ILLINOIS DEPARTMENT OF CORRECTIONS**
## OFFENDER'S GRIEVANCE

| Date: | Offender: (Please Print) Darryl Farmer | ID#: R80757 |
|---|---|---|
| Present Facility: Werture | Facility where grievance issue occurred: Stateville CC NRC |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [ ] Other (specify): _____

- [ ] Disciplinary Report: ____/____/____
  Date of Report          Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: On about 6-20-09, Dr. Thomas gave me a Physical Examination. At that time I told her that I had been taking PENICILLIN, but they were all gone and I needed something for my tooth. But she gave me nothing. She said that she would write it in my medical file. She tried to give me IBuprofen. I told her that I could not take IBuprofen because I have Ulcers.

Back →

Relief Requested: I'm REQUESTING $70,000 FOR PUNITIVE DAMAGES PERTAINING TO MY DENTAL MAL PRACTICE. And PAIN And SUFFERING.

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Darryl Farmer                    R80757  9,17,09
Offender's Signature                     ID#         Date

(Continue on reverse side if necessary)

---

**Counselor's Response (If applicable)**

Date Received: ____/____/____

- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

EXHIBIT
Farmer No. 1
10/24/12
PENGAD 800-631-6989

Print Counselor's Name          Counselor's Signature          Date of Response

---

**EMERGENCY REVIEW**

Date Received: ____/____/____

Is this determined to be of an emergency nature?

- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

RECEIVED
SEP 2 2 2009
OFFICE OF
INMATE ISSUES

Chief Administrative Officer's Signature          Date

ILLINOIS DEPARTMENT OF CORRECTIONS

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

I sat approximately 11 days before I was seen by Dr. Gwendlelyn Miles. She only wrote in my file that I needed my tooth pulled, never giving me anything to help the infected tooth. After seeing Dr. Miles, I was sent back to a cell in NRC again without anything to help with my tooth. After about a week my ~~tooth~~ mouth had swollen and began setting up an infection, which prevented me from eating and sleeping. Somewhere around July 5th, 2009, I was seen by Dr. Tallman. Dr. Tallman than sent me to the infirmary at Stateville CC. There I was on an IV for 4 days. My tooth still was not attended to and the condition got worse. Finally around July 9th, I was sent to U of I emergency department. Once I arrived there, I was told by doctors that my condition was so severe, I could have died and they sent me straight to surgery. All of the listed information is as accurate as I can put on paper as to the events that had taken place while I was in Stateville CC, NRC. The treatment I received while in Stateville CC NRC is cruel and unjust. I ask that my claim is carefully reviewed and proper actions be taken.

Plaintiff's Exhibit 1          Page 2

**Exhibit 2**

## Operative Report

FARMER, DARRYL - 80626677

* Final Report *

| | |
|---|---|
| Result Type: | Operative Report |
| Result Date: | July 10, 2009 12:00 AM |
| Result Status: | Auth (Verified) |
| Result Title: | Operative Report- ATTENDING:.Michael Miloro, DMD |
| Performed By: | Hussein, Raza on July 10, 2009 8:43 PM |
| Verified By: | Miloro DMD MD, Michael on July 15, 2009 8:43 AM |

# * Final Report *

### Operative Report- ATTENDING:.Michael Miloro, DMD (Verified)


                    University of Illinois Medical Center at Chicago

REPORT OF OPERATION                    PATIENT:  FARMER, DARRYL

DICT:   RAZA HUSSAIN              MRN:  080626677
ATTNG:  MICHAEL MILORO, MD        DATE OF SURGERY:  07/10/2009


PREOPERATIVE DIAGNOSIS:  Left submandibular, left pterygomandibular, left
lateral pharyngeal space abscesses impacted tooth #17.

POSTOPERATIVE DIAGNOSIS:  Left submandibular, left pterygomandibular, left
lateral pharyngeal space abscesses impacted tooth #17.

OPERATIVE PROCEDURE:
1. Extra-oral incision and drainage of left submandibular, left
   pterygomandibular and left lateral pharyngeal space abscesses.
2. Surgical extraction, tooth #17.

ATTENDING SURGEON:  Michael Miloro, DMD, MD

RESIDENT SURGEONS:  Dr. Raza Hussain
Dr. Ryan Shepherd

ASSISTANT:  Dr. Scott Wieskopf

FINDINGS:  Consistent with preoperative diagnosis.

ANESTHESIA:  General anesthesia via oral endotracheal intubation.


| | | |
|---|---|---|
| Printed by: | Rodriquez , Yolanda | Page 1 of 3 |
| Printed on: | 5/10/2010 11:18 AM | (Continued) |

EXHIBIT 3
WITNESS Dr. Thomas
DATE 7-6-12
K. CHALEM

63

# Operative Report

## FARMER, DARRYL - 80626677

\* Final Report \*

out posteriorly and anteriorly to open and explore the lateral pharyngeal
submandibular, submental and pterygomandibular spaces. Minimal purulence was
expressed, but thorough exploration was completed. Two Penrose drains were
placed into the left lateral pharyngeal submandibular, submental and
pterygomandibular spaces respectively. Attention was then directed intra-
orally to tooth #17. A moist throat pack was placed. The tooth could be seen
to have a large carious lesion on the mesial aspect. The tooth was elevated
and extracted with a #23 forcep. Minimal purulence was expressed from the
extraction site. No intra-oral perforation was noted. Copious irrigation was
then applied intra-orally and extra-orally to both surgical sites. Oral
cavity was copiously irrigated and suctioned dry. The throat pack was
removed. A naso-gastric tube was inserted, and all gastric contents were
suctioned out. The patient's care was then turned over to the Anesthesia
Service, and due to the serious nature of the patient's airway infection, the
decision was made to leave the patient intubated. The patient was transported
to the Surgical Intensive Care Unit in stable condition.

Dr. Michael Miloro was the attending of record for the procedure and was
present throughout the entire surgery.


DD:  07/10/2009 20:43:02
DT:  07/11/2009 20:55:18
RH/MedQ
JOB:  716386/379345871


**Completed Action List:**
\* Perform by  on July 10, 2009 8:43 PM
\* Transcribe by  on July 11, 2009 8:55 PM
\* Modify by Hussain MD, Raza on July 12, 2009 8:26 AM
\* Modify by Hussain MD, Raza on July 12, 2009 4:15 PM
\* Sign by Miloro DMD MD, Michael on July 15, 2009 8:43 AM Requested on July 10, 2009 8:43 PM
\* Modify by Miloro DMD MD, Michael on July 15, 2009 8:43 AM
\* VERIFY by Miloro DMD MD, Michael on July 15, 2009 8:43 AM


| | |
|---|---|
| Printed by: | Rodriquez , Yolanda |
| Printed on: | 5/10/2010 11:18 AM |

Page 3 of 3
(End of Report)

65

Plaintiff's Exhibit 2

Page 2

## Operative Report

# FARMER, DARRYL - 80626677

* Final Report *

FLUIDS:  800 mL.

MEDICATIONS:  3 grams Unasyn.

ESTIMATED BLOOD LOSS:  20 mL.

DRAINS:  Two 1/4-inch Penrose drains in the left submandibular,
pterygomandibular and lateral pharyngeal spaces.

SPECIMENS:  Wound cultures.

COMPLICATIONS:  None.

CONDITION:  Stable, to surgical intensive care unit.

NEEDLE AND SPONGE COUNTS:  Verified as being correct per nursing.

INDICATIONS FOR PROCEDURE:  The patient is a 46-year-old African American male
who is currently incarcerated in the state penitentiary, and presented to the
University of Illinois at Chicago Emergency Department with difficulty in
swallowing and breathing.  The patient had difficulty opening his mouth, and
was unable to tolerate his secretions.  The patient underwent a CT scan in the
Emergency Room and it showed marked left lateral pharyngeal, pterygomandibular
and submandibular space abscesses.  The patient was consented for risks,
benefits and alternatives for the planned procedure.  The patient's past
medical history was significant for hypertension, hyperlipidemia and GERD.
The patient reported no known drug allergies, and denied any illicit drug use.

OPERATIVE PROCEDURE:  The patient was taken to the OR on 07/10/2009, and
placed on the OR table in the supine position.  Monitors were applied, and the
patient underwent smooth induction of general anesthesia by the Anesthesia
Service via awake oral endotracheal intubation.  Once the endotracheal tube
was secured, the Oromaxillofacial Surgery Service prepped the patient
appropriately for a procedure of this type.  Approximately 8 mL of 2%
Lidocaine with 1:100,000 epinephrine was administered subcutaneously in the
area of the submandibular incision, and an 18-gauge needle on a 10-mL syringe
was inserted into the left submandibular space to try and express pus.  No
frank purulence was expressed with an 18-gauge needle, and decision was made
to proceed with incision and drainage.  A #15 blade was used to make an
incision approximately 2 cm below the inferior border of the mandible to avoid
the marginal mandibular branch of the facial nerve.  Blunt dissection through
subcutaneous tissue and platysmal muscle was completed, and a tonsillar
hemostat was directed towards the inferior border of the mandible and
medially.  Minimal purulence was expressed.  Blunt dissection was then carried

64

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of June, 2013 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Michael R. Slovis, Joel M. Koppenhoefer, Cunningham, Meyer & Vedrine, P.C., One E. Wacker Drive, Suite 2200, Chicago, Illinois 60601 and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: none.

/s/ <u>Kenneth N. Flaxman</u>
Kenneth N. Flaxman
ARDC 830399
200 S Michigan Ave, Ste 1240
Chicago, Illinois 60604
(312) 427-3200
*attorney for plaintiff*